THOMAS E. HUEY, Retired Circuit Judge.
The appellant was convicted of attempt to commit murder and assault in the first degree. He was sentenced to imprisonment in the penitentiary for eighteen years under Count I of the indictment and eighteen years under Count II, the sentences to run concurrently. The appellant pleaded not guilty, including self-defense.
I
On January 26, 1982, Rhonda Sparks, the ex-wife of Ricky Sparks, was at the ECM hospital in Florence, Alabama, attending her young daughter who was a patient at the hospital. The appellant, James Randall Borden, had been dating Rhonda Sparks for several months and was with her at the hospital on January 26. Ricky Sparks came to the hospital while the appellant and Rhonda Sparks were there. Ricky Sparks and the appellant left the hospital at different times and drove off in their automobiles.
Sparks testified that in his rear view mirror he saw appellant following in his car *403 and that appellant motioned for Sparks to pull over. Sparks testified that he pulled his car over near the curb and parked and that the appellant parked his car next to the driver’s side of Sparks’s car.
The appellant’s version is different. He testified that Sparks passed him between traffic lights and, while ahead of him, Sparks motioned for appellant to pull his car in beside him. The appellant pulled in and parked his car next to the driver’s side of Sparks’s car.
The testimony is conflicting as to what happened at this point. Sparks testified that as the appellant parked his car the latter said to Sparks, “Buddy I want to know what your problem is.” Sparks testified he responded, “Mister I don’t have a problem.” Sparks further testified, “And when I said that, I saw his pistol come up and he started shooting me.”
The appellant fired five shots and hit Sparks four times.
Sparks further testified that while still seated in his car he hit at appellant with a sawed-off ax handle which he kept in his car, and that he was able to hit the appellant as the appellant moved over to the passenger’s side of appellant’s car. Sparks testified that he finally heard appellant’s pistol click, knew it was empty, and then opened his door, jumped out of the car, ran around behind appellant’s car and then ran across the street and entered a nearby building.
The conflicting nature of the evidence is further indicated by the testimony of the appellant. Appellant testified that Sparks motioned for him to roll his window down. The following then appears in the transcript:
“Q. Okay, and did you roll your window down?
“A. That’s correct. I have electric windows.
“Q. All right, and what, if anything, was said between the two of you at that point?
“A. Very little. He made a remark, which it was an offhand remark, and I can’t swear what the actual words spoken — it was something like, what are we going to do — similar to that.
“Q. Okay sir. And what, if anything, did you respond?
“A. It was something like I don’t know what you mean, about that quick.
“Q. All right. What happened after that?
“A. Well, it was — what I’m fixing to say happened in an instant. As soon as he got through saying it, really before I could get out of my mouth, I saw his door, crack of his door, as it swing out and I saw his hand clutching the butt end of a stick.
“Q. Okay, sir. The stick that he had, was it similar in appearance to this stick right here?
“A. Yes, it was. Yes, it was. The butt end didn’t come out. This end came out first. I noticed the brown first. That’s how I remember that end came out first.
“Q. Okay, sir, and where were your hands at this point?
“A. I’m sure that one of them was in my lap, probably one on the wheel.
“Q. Okay. And do you have a gun? “A. That’s correct.
“Q. And is that the same gun that’s been introduced in evidence here today?
“A. That’s correct.
“Q. And do you have a permit for that gun?
“A. Yes, I do.
“Q. And did you have that gun with you on January the 26th?
“A. I did.
“Q. Do you have a — where was it located in the car at that time?
“A. Between my seat and my arm rest, kinda back up in the corner, tucked away where I could touch it with my fingertips.
“Q. Okay, now, if you would, imagine that you’re in your car in the driver’s seat as you were on this day, and that’s the front of your car, now where would your gun be located?
*404 “A. It would be right there. It’s under, kinda under the seat.
“Q. Okay, was it out in the floor or was it tucked back up under the seat?
“A. Tucked back under the seat.
“Q. Okay, and prior to the time that Mr. Sparks came out of his car with that stick, had you gotten that gun out or made any preparatory motions-to unbuckle the holster?
“A. No, sir, not prior.
“Q. Okay. After Mr. Sparks came out with that stick there, tell the jury what happened.
“A. Well, he came out and I thought as quick as I could and went for the gun, because I know — recognize a club when I see it, and I know animosity when I see it, and I sensed it and I went for my gun, and I proceeded to take it out of the holster.
“Q. Okay. Had he struck you at this point?
“A. He had struck my car.
“Q. Okay, what portions of his car did he strike?
“A. Around the window and the molding. I think my electric lock was the first thing to go.
“Q. The electric lock on the passenger’s door of your car?
“A. Yes.
“Q. Can you describe the motion that he used to knock the lock off?
“A. Well, to me, he was kind of in a rage. I mean, it was — he beat the hell out of it, really. I mean, he didn’t just swipe at it or whatever. He was hitting some pretty strong licks up and down and around. It was almost like tearing a window out or something.
“Q. Okay. Now, are you left or right-handed?
“A. Left-handed.
“Q. Which hand did you use to go to try to get your gun out from under the seat?
“A. I used my right hand to get it out.
“Q. Okay, and the gun, I believe, you stated was by your right foot?
“A. That’s correct.
“Q. Did you sustain any injuries, bodily injuries in this attack?
“A. Yes, I did.
“Q. Where were they located?
“A. They were located on my elbow.
“Q. Which elbow?
“A. On my right elbow. My left forefinger and my head, my temple.
“Q. Which side of your temple? Which temple, I mean?
“A. This side.
“Q. All right. Were you treated for those injuries?
“A. ECM Hospital emergency room.
“Q. Can you tell us in your own words what type of treatment you received down there?
“A. I received something to deaden it, I’m sure, and was stitches. I think six; I’m not sure.
“Q. Okay, and at this point, was Sparks by your window on the passenger side of your car?
“A. He was in the process of getting out of his car when I was going for my gun, and when I reached down for it, he was already like this and already — I’m already looking at the stick.
“Q. Okay, show the jury what you did— what motion you made to get the gun and what you did after you got it up.
“A. Of course, I can’t grasp it very well. I brought it up with my right hand, but I’m left-handed and I have to unsnap these snaps to get the gun out. All right, I’ve got two snaps. First I unsnap and, you know, it comes out — the wrong one. By this time, he’s swinging making licks on my car, so I turned around with this gun and pointed it — holding it with both hands, holding the scabert [sic] in my right hand, I was point it at him and still didn’t have it *405 out. I didn’t have my hand on the trigger or anything. And I finally got the other snap unsnapped, and then when I got it out, I throwed my holster down with my left hand and switched it over and grabbed it, and then I started shooting, just like that.
“Q. Okay, sir. To the best you can recall, Randall, were you getting hit during this period of time?
“A. I believe so. I know I got hit on my hand and my elbow.
“Q. Okay, and to the best that you can recall, would you describe to the ladies and gentlemen of the jury where exactly Sparks was with this stick at this time while you were getting your gun up and it’s still in its holster.
“A. He’s right on me, right — he’s just dead on me.
“Q. Did you ever shoot him while he was seated over in his own car?
“A. No sir.”
The appellant also testified that he did not move from the driver’s seat over to the passenger’s seat of his car, which is contradicted by testimony by Sparks.
The appellant further testified that Sparks struck appellant’s car and dented it with the ax handle.
Photographs admitted in evidence show four bullet wounds in Sparks’s body, and lacerations or contusions to appellant’s head and chest. Detective Rick Thompson testified that, among other wounds, the appellant had “a laceration to his right temple and the hair had been shaved away around it, and it had some stitches in it.”
II
The appellant contends that the trial court committed reversible error in admitting hearsay testimony by Ricky Sparks as to threats made by the appellant.
During the testimony of Ricky Sparks the following occurred:
“Q. Had you been threatened by Mr. Borden face to face?
“A. No I had not.
“Q. Had you had any threats communicated to you from a — from someone else?
“A. Yes, I had.
“Q. Who told you about that?
“MR. SLUSHER: Objection. It’s hearsay.
“THE COURT: Overrule the objection.
“Q. Who told you about that?
“A. His ex-wife, Paulette Borden, and my ex-mother-in-law, and by Rhonda, and by Cheryl Jones.
“Q. And what kind of threats were they?
“MR. SLUSHER: Same objection on the previous grounds stated, hearsay.
“THE COURT: All right. The question needs to be what threats were communicated to him.
“Q. What threats were communicated to you through those people?
“A. Well, Mrs. Louise Bates — that’s Rhonda’s mother — after Randall had started seeing her, she told me that for my protection I’d better—
“MR. SLUSHER: Objection, Your Honor. This again calls for hearsay, and he’s not testifying as to a threat made by Mr. Borden. Bates allegedly told him.
“THE COURT: I’ll say again, I’ll permit him to testify to anything in the nature of a threat that someone told him that Mr. Borden made toward him. Now, if that’s what your testimony is going to be, Mr. Sparks, go ahead. If it’s going to be something else, you need to ask him another question.
“Q. Tell us about any threats Mrs. Bates told you about.
“A. All right, this is something to do with it. Paulette Borden — she’s his ex-wife — I don’t remember the date. It was somewhere probably in the second week of November. I think I’m pretty close on that. She was — Louise Bates called me to her house one morning. I went down there and Paulette was there. And she was beat—
*406 “MR. SLUSHER: Objection, Your Honor.
“THE COURT: Sustain the objection. Just ask him another question because he’s not going to answer it the way you asked him to.
“Q. Because of those communications from the people that you’ve named, Mrs. Bates and Mrs. Borden, and your ex-wife, is that the reason you got police escort to and from Rhonda’s apartment?
“A. Yes, it was.”
To the question by the State, “Who told you about that?” the appellant objected on the ground of hearsay. The trial court overruled the objection. The State then repeated the question in exactly the same form. To this repeated question the appellant made no objection. It was not necessary to repeat the objection, as an objection previously made to the identical question had been overruled by the trial court. Wilson v. State, 37 Ala.App. 644, 73 So.2d 925 (1954); National Casualty Co. v. Dunn, 209 Ala. 484, 96 So. 576 (1923).
In response to this question Ricky Sparks gave the names of four people who he said had told him about threats. The testimony of Ricky Sparks that four people told him about threats made by appellant was hearsay and was not admissible. Riley v. State, 26 Ala.App. 203, 206, 155 So. 882 (1934); Biggs v. State, 20 Ala.App. 449, 103 So. 706 (1924); Hill v. State, 394 So.2d 106 (Ala.Cr.App.1981); Stokes v. State, 17 Ala.App. 27, 81 So. 363 (1919).
It is true that two of these four people, Rhonda Sparks and Cheryl Jones, took the stand and testified that the appellant made threats against Ricky Sparks in their presence. The State contends that this testimony renders the hearsay testimony harmless. We do not agree.
The appellant and Ricky Sparks each testified that the other was the aggressor and brought on the difficulty. Both were armed, one with a pistol and one with a sawed-off ax handle. Even if the testimony of Rhonda Sparks and Cheryl Jones could be said to have rendered harmless the hearsay testimony as to them, there remains the hearsay testimony of Ricky Sparks that his mother-in-law and the appellant’s ex-wife, Paulette Borden, told him of threats. Neither took the witness stand. We cannot say that this hearsay testimony did not injuriously affect the substantial rights of the appellant in the jury’s consideration of the case.
The record shows that after submission of the case to the jury, the jury requested additional instruction on the issue of self-defense, as follows: “Could you go over the self-defense thing when you charged us before we went in — could you go over that again — the claim of self-defense?”
The trial court then fully charged the jury again on the issue of self-defense.
For the error in admitting the hearsay testimony of Ricky Sparks of threats made by the appellant, the judgment of conviction must be reversed.
Ill
The appellant also contends that the trial court erred in allowing in evidence the testimony of Cheryl Jones.
The appellant filed a motion for discovery containing, among other things, a request for a list of all witnesses to be called by the State. The State filed an answer to the motion for discovery stating, among other things, that the names of witnesses to be called by the State are not discoverable. The trial court reserved ruling on the motion for discovery until oral argument could be held. The record indicates that the motion was never ruled on.
In brief, the appellant contends that the State agreed to provide the appellant with a list of the State’s witnesses. The State does not admit that such an agreement was made. It appears that a list of witnesses was attached to the indictment in this case. Such list did not include the name of Cheryl Jones.
On the trial the State offered Cheryl Jones as a witness. No objection was *407 made by appellant before she testified. No objection to her appearing and testifying was made at any time by the appellant during the period of her testifying, and her testimony, direct and cross, covers more than five transcript pages. Another witness for the State testified immediately following Cheryl Jones and only at the conclusion of the testimony of such witness did the appellant object to the State’s calling Cheryl Jones as a witness.
Inasmuch as this case is to be tried again, it is probably unnecessary to rule upon the alleged error in overruling appellant’s objection to the testimony of Cheryl Jones, as this situation will not likely recur in a second trial. However, it may be observed that in the case of Peoples v. State, 418 So.2d 935 (Ala.Cr.App.1982), this court held that an appellant has no statutory or constitutional right to discover the names of the State’s witnesses.
The appellant did not object when Cheryl Jones was offered as a witness and made no objection to her testifying at any point during her testimony. Only after another witness had testified, immediately after Cheryl Jones, did the appellant interpose an objection to the State’s calling her as a witness. As stated in the case of Gilbreath v. Gilbreath, 278 Ala. 289, 177 So.2d 915 (1965): “... a party may not sit idly by and voice no objection to a question until after it is answered, speculating as to what the answer will be, and if unsatisfactory, thereafter invoke the ruling of the court.” See also Baldwin v. McClendon, 292 Ala. 43, 288 So.2d 761 (1974), and cases cited therein.
We find no error in the trial court’s overruling such objection.
Because of the admission of hearsay testimony concerning threats made by the appellant, the judgment of conviction by the lower court is reversed and the cause is remanded for further proceedings.
The foregoing opinion was prepared by the Honorable THOMAS E. HUEY, Jr., Retired Circuit Judge, temporarily on duty on the court pursuant to § 12-2-30(b)(6), Code of Alabama 1975; his opinion is hereby adopted as that of the court.
REVERSED AND REMANDED.
BOWEN, P.J., and HARRIS and SAM TAYLOR, JJ., concur.
TYSON, J., dissents without opinion.